47 F.3d 1173
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Mahmood MIRHOSEINI and Mary Cayton, Plaintiffs-Appellants,
v.
TRIMEDYNE, INCORPORATED and Vigilant Insurance Company,
Defendants-Appellees.
 No. 94-2828.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 6, 1994.
Decided Feb. 22, 1995.
 
 Before REAVLEY,* EASTERBROOK and MANION, Circuit Judges.
 
 ORDER
 
 1
 On September 28, 1990, shortly before the demise of the Soviet Union, Mahmood Mirhoseini and Mary Cayton were injured in a car accident while on the way to the Moscow airport after attending a symposium in laser angioplasty. The symposium was sponsored by the Baculev Institute for Cardiovascular Surgery with some cooperation from Trimedyne, Inc. At the time of the accident, Mirhoseini and Cayton were passengers in a car being driven by Dr. Buziashvili, an employee of the Institute. Mirhoseini and Cayton sued Trimedyne alleging that the symposium was a joint venture making Trimedyne liable for the negligence of the Institute's driver, Dr. Buziashvili. The district court granted summary judgment for Trimedyne finding that there was no joint venture and therefore no possibility of liability on the part of Trimedyne. We affirm.
 
 I. Background
 
 2
 Sometime in 1990, the Baculev Institute for Cardiovascular Surgery (the "Institute") decided to sponsor a symposium on laser angioplasty. The symposium was to be held in Moscow, USSR, where the Institute is located. The Institute's stated purpose was to educate Russian doctors about current methods and procedures involving laser angioplasty. The Institute contacted Trimedyne, Inc. ("Trimedyne"), a California corporation which manufacturers and sells laser angioplasty equipment, and invited Trimedyne to display and demonstrate its products at the symposium. After reviewing the Institute's plans, Trimedyne agreed to participate in the symposium in order to promote its products in the Soviet Union.
 
 
 3
 Trimedyne provided the Institute with considerable advice and assistance concerning the organization and presentation of the symposium. At the Institute's request, Trimedyne provided a list of American and European doctors who were recognized for their expertise in the field of laser angioplasty. Trimedyne also called some of these physicians to determine whether they would be available for the symposium. In cooperation with the Institute, Trimedyne helped those physicians who were interested obtain visas for travel to the USSR. Dr. Mirhoseini ("Mirhoseini") was among the doctors Trimedyne contacted about the symposium. Mary D. Cayton ("Cayton"), who was also injured, is Mirhoseini's wife; she also works as a nurse in his office.
 
 
 4
 Trimedyne provided the Institute with other assistance in connection with preparations for the symposium. Trimedyne agreed to pay the airfares of foreign doctors visting Moscow for the symposium in lieu of the fee that is usually charged for displaying products at similar medical conventions or seminars. In addition, Trimedyne produced a promotional brochure describing the symposium as well as the literature that was distributed during the symposium. But there is no evidence of any agreement between Trimedyne and the Institute to share any profits or losses from the symposium.
 
 
 5
 The Institute formally invited many of the doctors recommended by Trimedyne to the symposium, made the travel arrangements for its guests. Once they landed in Moscow, the Institute provided the visiting physicians with lodgings and meals. Upon arrival each visiting guests was greeted by a representative of the Institute upon arrival. At the direction of Dr. Valery S. Chekanov ("Chekanov"), the Deputy-Director of the Institute, Mirhoseini and Cayton were greeted by Dr. Yuri Buziashvili ("Buziashvili"), the Chief of the Institute's Electrophysiology Laboratory. When the symposium concluded, Buziashvili arranged to drive Mirhoseini and Cayton to the Moscow airport. During that ride a Soviet military vehicle collided with Dr. Buziashvili's car, and Mirhoseini and Cayton were seriously injured. There seems to be no serious dispute about Buziashvili's negligence.
 
 
 6
 Mirhoseini and Cayton sued Trimedyne, alleging that the symposium was a joint venture making Trimedyne liable for the negligence of Buziashvili, an employee of the Institute. At the close of discovery, the district court found that the symposium was not a joint venture and granted Trimedyne's motion for summary judgment. The district court found that under California law there was no joint venture because there was (1) no community or joint interest in a common business undertaking, and (2) no agreement to share profits and losses. Mirhoseini and Cayton appeal.
 
 II. Analysis
 
 7
 We review the district court's grant of summary judgment de novo, drawing all reasonable inferences from the record in the light most favorable to the non-moving party. Donovan v. City of Milwaukee, 17 F.3d 944, 947 (7th Cir.1994); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The non-moving party must identify specific facts to establish that there is a genuine triable issue. Donovan, 17 F.3d at 947. "Unless we find evidence sufficient to sustain a jury verdict in favor of the non-moving party, we will affirm the grant of summary judgment." Id. As a federal court sitting in diversity, we must also determine whether the district court properly applied the relevant state substantive law. Colip v. Clare, 26 F.3d 712, 714 (7th Cir.1994). In this case, the parties agree that the law of California governs, and therefore we must determine, as best we can, how California's highest court would resolve this dispute. Todd v. Societe Bic, S.A., 21 F.3d 1402, 1405 (7th Cir.1994); L.S. Heath & Son v. AT & T Information Systems, 9 F.3d 561, 574 (7th Cir.1993).
 
 
 8
 Under California law, a joint venture exists when there is "an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control." Connor v. Great Western Savings and Loan Association, 73 Cal.Rptr. 369, 375 (Cal.1969). Where, as here, there is no conflicting extrinsic evidence concerning the terms of the contract creating the relationship, the existence of a joint venture is a question of law. County of Riverside v. Loma Linda University, 173 CalRptr 371, 377 (Cal.Ct.App.1981). The question is whether the parties to a contract have created a joint venture or some other relationship involving cooperative effort. Id. In this case the question arises because "The negligence of one joint venturer or of his employees acting in connection with the joint venture is imputed to the other joint venturers." Loma Linda, 173 Cal.Rptr. at 376 n. 3 (brackets, quotations, and citations omitted). Thus, if the symposium was a joint venture, and if transporting attending physicians to and from the airport was within the scope of that venture, then Trimedyne could be liable for the negligence of Buziashvili.
 
 
 9
 On appeal, Mirhoseini and Cayton argue that the district court erred when it found that the symposium on laser-angioplasty was not a joint venture between the Institute and Trimedyne. Specifically, they argue that the district court erred when it found, as a matter of law, that the Institute and Trimedyne had (1) no community or joint interest in a common business undertaking, and (2) no agreement to share profits and losses. Mirhoseini and Cayton argue that there are genuine issues of material fact that precluded summary judgment on either ground. They assert that since both the Institute and Trimedyne stood to gain or lose depending on the symposium's success, a jury could find that there was at least a tacit agreement to share profits and losses sufficient to establish this element of a joint venture. They also assert that Trimedyne and the Institute both acknowledged that their cooperation with respect to the symposium would be mutually beneficial, and they argue that this evidence would allow a jury to find that the Institute shared a common interest in the symposium.
 
 
 10
 A. Absence of an agreement to share profits and losses.
 
 
 11
 An understanding with respect to the sharing of profits and losses is an essential element of a joint venture. Connor v. Great Western Savings and Loan Association, 73 Cal.Rptr. at 375; Cislaw v. Southland Corporation, 6 CalRptr.2d 386, 395 (Cal.Ct.App.1992) In this case, Mirhoseini and Cayton have presented no evidence of any agreement to share profits or losses. Instead, they have presented evidence which shows that the Institute and Trimedyne recognized that their cooperation would be mutually beneficial. They argue that this acknowledgement of mutual benefit, when coupled with the recognition that each party's efforts would be lost if the symposium was a failure, is "an understanding as to the sharing of profits and losses" sufficient to establish this element of a joint venture.
 
 
 12
 But proof that a cooperative effort may occasion benefits or losses to its participants does not establish "an understanding as to the sharing of profits and losses" as that term has been interpreted by the California Supreme Court. Rather, California requires an agreement to actually pool and share profits and losses in order to show an "understanding as to the sharing of profits and losses" sufficient to establish the existence of a joint venture. For example, in Connor, the California Supreme Court held that an elaborate and mutually beneficial financing arrangement between a residential developer, Conejo, and its financing institution, Great Western, was not a joint venture. The court wrote:
 
 
 13
 Although the evidence establishes that Great Western and Conejo combined their property, skill, and knowledge to carry out the tract development, that each shared in the control of the development, that each anticipated receiving substantial profits therefrom, and that they cooperated with each other in the development, there is no evidence of a community or joint interest in the undertaking. Great Western participated as a buyer and seller of land and lender of funds, and Conejo participated as a builder and seller of homes. Although the profits of each were dependent on the overall success of the development, neither was to share in the profits or the losses that the other might realize or suffer. Although each received substantial payments as seller, lender, or borrower, neither had an interest in the payments received by the other. Connor, 73 Cal.Rptr. at 375 [emphasis supplied].
 
 
 14
 And other cases confirm that one must show more than the mere possibility that a cooperative effort may occasion benefits or losses to its participants in order to establish the existence of a joint venture. See Cislaw v. Southland Corporation, 6 CalRptr.2d at 395 (franchise agreement where franchise fee is a percentage of monthly sales did not create joint venture because there was no agreement to share profits and losses); 580 Folsom Associates v. Prometheus Development Company, 272 Cal.Rptr. 227, 235-37 (Cal.Ct.App.1990) (purchase agreement governing real property was not a joint venture where seller was entitled to purchase price but no share of profits generated by development project); Tomei v. Fairline Feeding Corporation, 137 Cal.Rptr. 656, 659-60 (Cal.Ct.App.1977) (cattle feeding venture was not joint venture in part because only the investor bore the risk of loss while the program manager was guaranteed its fees such that there was no sharing of profits or losses). These cases confirm that one must show an agreement for the pooling and shifting of profits and losses in order to show "an understanding as to the sharing of profits and losses" sufficient to establish a joint venture under California law. Put another way, the parties must have some interest in the benefits of their co-venturers, i.e. there must be a common or shared interest, before a cooperative effort can be called a "joint" venture. See Connor, 73 Cal.Rptr. at 375.[1]
 
 
 15
 For the foregoing reason, we AFFIRM.
 
 
 
 *
 Hon. Thomas M. Reavley, of the Fifth Circuit, sitting by designation
 
 
 [1]
 Plaintiffs have failed to establish an agreement to share profits and losses, an essential element of a joint venture. Because this negates their claim, we need not decide whether Trimedyne and the Institute were involved in a common business undertaking. But we note that a joint venture is a common business undertaking. Connor v. Great Western Savings and Loan Association, 73 Cal.Rptr. at 375; Cislaw v. Southland Corporation, 6 CalRptr.2d 386, 395 (Cal.Ct.App.1992), and that the undisputed evidence clearly shows that the symposium was not a common business undertaking. The Institute's goal was educational. Trimedyne's goal was commercial. In our view, both parties to a joint undertaking must have a business purpose, i.e. a common business purpose, before that undertaking will be treated as a joint venture under California law